IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| World Wide Stationery Manufacturing, Co., Ltd., | Case 3:11 CV 523 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER RE: DAMAGES |
| -vs- | JUDGE JACK ZOUHARY |
| Bensons International Systems, Inc., et al., | |
| Defendants. | |

## INTRODUCTION

Before this Court is Plaintiff World Wide Stationary Manufacturing Co., Ltd.'s ("World Wide") Motion for Partial Summary Judgment Regarding Damages (Docs. 97 & 98), which Defendant Bensons International Systems, Inc. ("Bensons") opposes (Doc. 108). With agreement of counsel, and pursuant to this Court's Trial Order (Doc. 104), World Wide's Motion is treated as a motion *in limine*. The parties submitted a joint report of undisputed and disputed facts pertaining to the Motion (Doc. 107).

In its Motion, World Wide asks this Court to rule on two separate issues. First, World Wide requests a determination, as a matter of law, that Bensons is not entitled to seek lost profits as a remedy for the alleged patent infringement in this case. Second, World Wide contends that, in the event infringement is found, the appropriate measure of damages is an "established royalty" that was agreed to in a 2004 licencing agreement for the 6,840,695 Patent ("'695 Patent") between World Wide and Esselte Leitz GmbH & Co KG, the Patent's record owner (Doc. 98 at 5).

According to Bensons, both of these issues are properly reserved for a jury. Specifically, Bensons argues it is entitled to present a lost profits theory of damages to the jury because "but for [World Wide's] infringing sales, [Bensons] had the capacity to supply ring metals to the market" (Doc. 108 at 5). Additionally, Bensons asserts there is no established royalty for the '695 Patent, arguing that the outcome of damages "depends to a large extent upon the predicate facts the jury believes and then which expert's analysis they believe" (Doc. 108 at 19). The matter has been fully briefed, and this Court will address each issue below.

## DISCUSSION

**Bensons May Assert A "Lost Profits" Theory of Damages**

Under 35 U.S.C. § 284, this Court "shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use of the invention by the infringer." While the determination of damages under this statute is left to the sound discretion of this Court, several legal principles guide the determination. *See Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 275 (Fed. Cir. 1985). For instance, "the availability of lost profits is a question of law for the court, not the jury." *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1293 (Fed. Cir. 2007) (citing *Poly-America, L.P. v. GSE Lining Tech, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004)). "Only after the court has decided, as a matter of law, that lost profits are available does the jury then get to determine the amount of those lost profits." *Id.* (citing *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1373 (Fed. Cir. 2003)).

While "[i]t is well settled that proof of lost profits need not be absolute" to be an appropriate remedy, "lost profits must be proven to a reasonable probability." *Yarway*, 775 F.2d at 275. To recover lost profits, Bensons, as the patent holder, "must show causation in fact, establishing that but

2

for the infringement, [it] would have made additional profits." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011); *see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996).  Bensons may establish the requisite "but for" causation by proving (1) a demand for the patented product, (2) an absence of acceptable non-infringing substitutes, (3) the manufacturing and marketing capability to exploit the demand, and (4) the amount of profits it would have made.  *Siemens*, 637 F.3d at 1287; *see also Yarway*, 775 F.2d at 275.  The parties do not dispute factors (1), (2), and (4).  Instead, both sides focus exclusively on the third factor:  whether Bensons had the ability to meet the market demand from March 30, 2010 to present, the stipulated damages period (Docs. 98 at 9–13; 108 at 10–13).

World Wide's position with respect to manufacturing and marketing capability to meet demand is twofold.  First, World Wide argues "Bensons has never had, and does not presently have, any manufacturing capacity that would allow it to manufacture ring metals to be sold in the United States."  Second, "Bensons does not sell, and has never sold, its own ring metal products that could or would compete for sales with World Wide's ring metal products within the United States."  Therefore, according to World Wide, Bensons cannot satisfy its burden because "a necessary element of proof of a lost profits claim is that the patentee actually have manufacturing capability and actually make a product that competes with the allegedly infringing product" (Doc. 98 at 5).  These arguments fail.

Until 2010, Bensons sold ring metal products, covered by the '695 Patent, and manufactured by World Wide, to R.R. Donnelley -- an arrangement that allowed Bensons to make up to a 28% profit. In 2010, however, World Wide and R.R. Donnelley cut out the middleman and established a supply relationship by which World Wide directly supplied R.R. Donnelley with the patented ring

3

metals. World Wide now asks Bensons: "How are you going to meet the market demand for the patented ring metals when you do not actually manufacture anything?" Bensons' glib reply: "Through you guys." Indeed, despite their severed relationship, Bensons believes it continues to have the manufacturing capacity to make any sales lost to World Wide through a 2002 Supply Agreement -- still in place -- requiring World Wide to supply all ring metals ordered or requested by Bensons (Doc. 108 at 7).

The 2002 Supply Agreement clearly lists World Wide as "The Supplier," and defines "Bensons Company" as including all Bensons-related companies (Doc. 108-4 at 4). The products subject to the Agreement are broadly defined as "ring mechanisms, lever arch mechanisms and clips for binder and other similar paper holding devices . . . all of which shall be fully finished" (Doc. 108-4 at 5). Most importantly, Section 3 of the Agreement defines World Wide's obligations to supply Bensons with whatever quantities of ring metal products requested (Doc. 108-4 at 6–7) (emphasis added):

> 3.1 During the continuance of this Agreement the Supplier agrees to sell at the prices specified in Clause 4 and the Customer agrees to purchase such quantities of the Products as may be ordered by the Customer from time to time, subject to the terms and conditions of this Agreement.
>
> \* \* \* \* \*
>
> 3.4 *The Supplier undertakes during the continuance of this Agreement to fulfill all orders for the Products placed by the Customer or by any other Bensons Company pursuant to this Agreement* and to do so with equal priority to orders placed by the most favoured customers or potential customers of the relevant Worldwide Company and *to procure at all times that sufficient quantities of the Products are available to meet the requirements of each and every Bensons Company*. In order to assist the Supplier to meet requirements the Customer should every month send a 3-month rolling forecast on volumes to the Supplier.

4

In short, the 2002 Agreement establishes that Bensons has sufficient manufacturing capacity to meet the market demand because World Wide is contractually obligated to supply Bensons with whatever capacity is required. World Wide's CEO, Simon To, admits as much (Doc. 108-5 at 5–6):

Q: Okay. During the terms of this supply agreement from August 2002 to the present, was there a time where World Wide was unable to supply any of it's [sic] customers with easy comfort three products[, the relevant ring metals]?
A: No.

Q: So at all times that you're aware from August 2002 to the present, World Wide was able to meet all demand for the easy comfort three product?
A: Yes.

\* \* \* \* \*

Q: On that if under the supply agreement it was understood that if Bensons placed and [sic] order for the easy comfort three or easy touch product, World Wide would fulfill those orders?
A: Yes.

Even if the 2002 Supply Agreement failed to demonstrate the requisite manufacturing capacity, Bensons has shown that Ring Alliance, its sister company, had the capacity to supply the ring metals necessary to meet the market demand. According to Bensons' U.S. sales manager, Ring Alliance has had the capacity to manufacture ring metals since at least January 2010 (Doc. 108-2 at 14–15). Further, there is evidence that although World Wide was Bensons' main supplier, Bensons "sometimes" acquired ring metals from Ring Alliance (108-3 at 5).[1] Nothing in the record refutes this evidence.

---

[1] Whether these ring metals were covered by the '695 Patent is unknown, but irrelevant. The fact of the matter is Ring Alliance has the capacity to manufacture ring metals and is therefore capable of providing Bensons with the necessary patented products to ensure the market demand is met.

World Wide's long list of legal citations does nothing to change the outcome in this case. The unifying theme of its authorities is that a patentee without evidence of *any* manufacturing capacity is not entitled to lost profits. *See e.g.*, *Wechsler*, 486 F.3d at 1294 (lost profits unavailable because patentee "lacked the capability to manufacture his device during the period of infringement," despite his ability to do so after the period of infringement); *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1551–52 (Fed. Cir. 1991) (patentee's contention that it "had the capacity to manufacture, market, and sell" the products was unsupported by the record, which "at best" supported patentee's "tentative" and "speculative" plans for manufacture in the future); *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 673 (Fed. Cir. 1988) (lost profits could not be recovered where one plaintiff lacked capability to manufacture product commercially, and the other plaintiff got out of the business and had its license revoked; however, lost profits could be awarded during the period plaintiff was a licensee and competitor); *Poly-America*, 383 F.3d at 1311 (for a lost profits award, "the patentee needs to have been selling [not manufacturing] some item, the profits of which have been lost due to infringing sales"); *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1119 (Fed. Cir. 1996) (whether patentee could meet his burden of showing capacity to meet market demand required "the attention of the trier of fact"); *see also Gargoyles Inc. v. United States*, 113 F.3d 1572, 1578 (Fed. Cir. 1997) (lost profits were not recoverable because patentee did not prove capacity to produce a sufficient amount of acceptable product for military use).

Bensons, unlike the above cases, had the requisite manufacturing capacity during the period of infringement by virtue of its 2002 Supply Agreement as well as through Ring Alliance. It is clear from the case law that the only question that matters under the third factor of a lost profit analysis is whether the patentee can meet the market demand -- not whether the patentee *itself* manufactures its

6

own product. *See e.g.*, *Yarway*, 775 F.2d at 275 (the relevant factor is "the plaintiff's ability to meet the market demand"). World Wide's citations miss this fundamental point.

Furthermore, this Court rejects World Wide's argument that Bensons is not entitled to lost profits because Bensons does not sell products that compete with World Wide's products. Clearly, the two parties do compete with one another for sales of products covered by the '695 Patent. As already explained, World Wide eliminated the need for Bensons as a distributor and, in doing so, created direct competition between it and Bensons, who is still in the business of selling products covered by the '695 Patent. To the extent World Wide argues a patentee must sell "its own products" as opposed to products manufactured by a third party, *Yarway* unmistakably rejects that position. 775 F.2d 268.

*Yarway* affirmed a lost profits award to the patent licensee despite the fact it generally purchased the products at issue from Kalle, one of the defendants in the case and the owner of the patent at issue. *Id.* at 270, 276–77. Like Bensons here, Yarway acquired exclusive rights to the patent from Kalle. However, rather than always manufacturing the product, Yarway generally purchased from Kalle, just like Bensons purchases its ring metals from World Wide. *Id.* at 270. A few years after Yarway and Kalle entered into their contract, Eur-Control (Kalle's sister company) began selling a competing product in the United States. *Id.* Yarway responded by suing Eur-Control for infringement and Kalle for inducement of the infringement.

After prevailing at trial, Yarway was awarded lost profits. The district court held "Yarway found it 'virtually impossible to sell the [patented products purchased under the contract] within the United States because of the considerable price advantage Euro-Control USA had for its own products over the products which Yarway purchased from [Kalle] for resale.'" *Id.* at 272. Defendants appealed

and challenged the lost profits award based on the absence of the ability to meet market demand. *Id.* at 275–76. The Federal Circuit rejected the challenge and held that Yarway had the ability to meet market demand despite the fact it obtained its products from one of the defendants. And, additionally, Yarway spent a great deal of time and money developing a market for the product at issue. *Id.* at 276.

Like Yarway, Bensons had the ability to meet market demand despite the fact it obtained its products from World Wide, who is contractually obligated to supply Bensons with whatever ring metals it orders. Moreover, Bensons has spent a great deal of time and money developing a market for the ring metals covered by the '695 Patent. For instance, Bensons negotiated a licence agreement with Esselte/Horn in 2000, and again in 2010, providing for royalty payments per units sold (Doc. 107 at 3). Bensons also entered into an Exclusive Marketing and License Agreement with R.R. Donnelley, whereby R.R. Donnelley agreed to pay a price that reflected a 28% gross margin on the patented ring metals (Doc. 107 at 2–3). However, after being snubbed by World Wide and R.R. Donnelley, Bensons has no chance in the market, as it is unlikely Bensons can compete with the prices World Wide is able to offer by selling directly. *See Wechsler*, 486 F.3d at 1294 (lost profits are available when infringing sales "erode[] the market price [a patentee] was able to charge for his product"). Accordingly, Bensons -- like Yarway -- satisfies the third factor of the lost profit analysis, despite its reliance on a supplier to actually make and sell ring metals.

### There Is No Established Royalty Rate for The '695 Patent

Where a patentee is unable to prove entitlement to lost profits, a reasonable royalty may be used to calculate actual damages. *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir.1995); *see also Sanofi-Aventis v. Apotex, Inc.*, 659 F.3d 1171, 1179 (patent damages consist of a reasonable royalty *or* the patentee's lost profits, including pre-judgment interest). A reasonable

8

royalty is the amount a person desiring to manufacture, use, or sell the patented product would be willing to pay as a royalty and yet be able to make a profit. Essentially, it is a damages amount "based upon a hypothetical negotiation between the patentee and the infringer when the infringement began." *Unisplay*, 69 F.3d at 517.

The Federal Circuit has unequivocally held that "[t]he amount of damages based on a reasonable royalty is an issue of fact." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003) (citing *Unisplay*, 69 F.3d at 517). While determining a reasonable royalty "involves an element of approximation and uncertainty, [the] trier of fact must have some factual basis . . . ." *Unisplay*, 69 F.3d at 517. To aid in the jury's determination of a reasonable royalty, the Federal Circuit has adopted a comprehensive list of relevant factors. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (recognizing adoption of factors in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)).

World Wide however contends the applicable royalty in this case has been established by the parties (Doc. 98 at 14). To be sure, "[a]n established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree." *Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007). However, damages based on an established royalty are only appropriate when "the patentee has consistently licensed others to engage in conduct *comparable* to the defendant's at a *uniform* royalty . . . ." *Id.* at 979 (citing *Birdsall v. Coolidge*, 93 U.S. 64, 70 (1876)) (emphasis added). This is where World Wide falls short.

In support of its position, World Wide relies solely on a 2004 Agreement between World Wide and Esselte. According to World Wide, the $0.02 and $0.03 per unit royalty established in that

agreement is the actual rate to which World Wide, a willing licensee, and Esselte, the patent owner, agreed (Doc. 98 at 14–15). World Wide, however, ignores another agreement in 2008 titled "Exclusive Marketing and License Agreement" between Bensons and R.R. Donnelley (Doc. 108 at 14). That agreement is the actual license for the '695 Patent, where Bensons licensed the right to "use, offer for sale, sell and import" the patented ring metals to R.R. Donnelley in return for a 28% gross margin -- a rate far from "uniform" with the rate in the 2004 Agreement.

Moreover, World Wide's 2004 Agreement is not instructive as to an established royalty because that agreement was made between an individual inventor and a manufacturer -- an economic relationship quite different from that between two entities competing for sales of the same ring metals. The 2008 Agreement between Bensons and R.R. Donnelley involves a distributor and a customer. Of course, distributors such as Bensons are always going to seek higher royalties from competitors such as World Wide than from non-competitors. In short verse, this is not a case where Bensons, as patentee, "has consistently licensed others to engage in conduct comparable to [World Wide's] at a uniform royalty." *Monsanto*, 488 F.3d 973, 979 (established royalty appropriate because patentee consistently licensed farmers the use of its technology pursuant to terms of a standard license agreement).

Even if the 2008 Agreement did not refute World Wide's theory of an established royalty, the 2004 Agreement could not establish the royalty rate because that Agreement, by the admission of World Wide's own damages expert, was deemed "legally void" by a German court (Doc. 108-8 at 20), which held "[Bensons] is the owner of the exclusive rights for unlimited use of the" '695 Patent in the United States (Doc. 10-6 at 2). World Wide cites no cases -- and this Court has found none -- where a void licensing agreement served as the basis for an established royalty rate.

Moreover, an issue of disputed fact clearly exists regarding the proper royalty rate in this case. Bensons' damages expert Gemini has analyzed the *Georgia-Pacific* factors (Doc. 108-11 at 17–28) and opines the "license agreements do not provide for an established royalty nor an indication as to a royalty rate for the '695 Patent based upon a hypothetical negotiation between Bensons and [World Wide]" (Doc. 108-11 at 19). According to Gemini, "a running royalty rate of 20% is reasonable for a license between Bensons and World Wide for the '695 Patent," for a total royalty of at least $6,065,076, plus pre-judgment interest (Doc. 108-11 at 28–29).

World Wide's damages expert Martinez has likewise analyzed the *Georgia-Pacific* factors in his expert report (Doc. 108-8 at 18–27) and concludes "an appropriate reasonable royalty in this instance would be a royalty rate of not less than $0.02 [2.4%] and no more than $0.03 [3.6%] per unit on World Wide's past sales of the accused products" (Doc. 108-8 at 19). Under his calculations, the appropriate royalty damages would be an amount between $589,046 and $883,569 (Doc. 108-8 at 27). The experts clearly disagree.

Simply put, this is a classic case of dueling experts. *See Micro Chem.*, 317 F.3d at 1394. Each side will have an opportunity to present its damages theory and convince a jury. As Bensons notes, the appropriate royalty will largely depend on whose predicate is believed, and then which expert's analysis is believed, a determination for the jury and not for this Court.

## CONCLUSION

For reasons set forth above, World Wide's Motion for Partial Summary Judgment Regarding Damages is denied.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

August 7, 2012